**Frederich G. MEDER; Evelyn Meder, Appellants,**

v.

**EVEREST & JENNINGS, INC., Appellee.**

**No. 80-1180.**

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 14, 1980.

Decided Jan. 13, 1981.

---

Paul Redfearn, Kansas City, Mo., argued; William H. Pickett, Kansas City, Mo., on brief, for appellants.

William L. Davis, Moser, Marsalek, Carpenter, Cleary, Jaeckel, Keaney & Brown, St. Louis, Mo., for appellee.

Before STEPHENSON and HENLEY, Circuit Judges, and HUNTER,* District Judge.

STEPHENSON, Circuit Judge.

Frederich and Evelyn Meder appeal from the jury verdict of the district court[1] denying them recovery on their theory of products liability and negligence. Appellants seek recovery for injuries sustained by Frederich Meder on April 23, 1973, when he fell from a wheelchair manufactured by appellee, Everest & Jennings. On appeal, appellants allege several errors in the trial. We reverse and remand.

The thrust of plaintiff-appellant's contentions is that defendants had manufactured and designed his wheelchair in a defective condition thereby making it unreasonably dangerous when used by plaintiff in a use that was reasonably forseeable. The basis of the alleged defect is that the wheelchair was unstable when its occupant leaned forward. Appellant offered expert testimony that with a shift of only 2.32 inches forward, the wheelchair would tip forward and its passenger would fall out. Appellant claims this characteristic made the chair unreasonably dangerous and the manufacturer did nothing to correct the defect or warn purchasers. This was true even though the manufacturer allegedly knew or had reason to know of the defect.

## FACTUAL BACKGROUND

In 1969, appellee Everest & Jennings manufactured and sold appellant a "Premier Everest & Jennings Wheelchair" through the March of Dimes. From the time Meder acquired the chair until he was injured, he did not receive any instructions, literature, or other materials from Everest & Jennings regarding any forward instability of the wheelchair. The Owner's Manual did not contain any specific warnings in this regard.

Subsequent to the acquisition and prior to the accident, Meder replaced the original upholstery and armrest furnished with the chair. Meder testified that at the time of the accident the wheelchair had blue upholstery as opposed to its original upholstery and that originally "the arm rests were of a longer nature." Otherwise, the wheelchair was in substantially the same condition as when manufactured.

This action concerns the events occurring on April 23, 1973. In the morning of that day, Frederich Meder arrived in his car at the Rupprecht Heating and Air Conditioning Company in Jennings, Missouri. He was employed there as secretary/treasurer and office manager. Meder had been confined to a wheelchair since 1945, as a result of polio.

Apparently there had been a routine for many years that when Meder arrived, one of the employees of Rupprecht would meet Meder with the wheelchair involved in this suit, help Meder into the chair, and wheel him into the Rupprecht office.

On April 23, the employee helping Meder was Wallace Taylor. After Taylor had helped Meder into the wheelchair from the passenger side of the automobile, Taylor began to wheel Meder toward two side by side doors on the west side of the building. The northern door led to Meder's office area and the southern door led to a supply area. Running parallel to and in front of the building was a sidewalk. In front of the building was a black asphalt drive and a parking lot. There was a three to five inch difference in height between the drive and the sidewalk.

Meder had payroll records, a payroll ledger, and a lunch pail on his lap. Meder held these items with his right arm and held the armrest with his left hand.

Taylor testified that he backed Meder from the automobile and pushed him to the sidewalk to a point just south of the office

---

* The Honorable Elmo B. Hunter, sitting by designation on this panel, is now Chief Judge of the United States District Court for the Western District of Missouri.

1. The United States District Court for the Eastern District of Missouri, the Honorable William L. Hungate presiding.

door. Taylor placed his foot on a rubber rudder on the back of the wheelchair to secure the back wheels as he pushed down on the handlebars to lift the front wheels onto the sidewalk. He pushed the wheelchair slowly forward until the back wheels reached the sidewalk. He then lifted the handlebars slightly so that the back wheels were raised onto the sidewalk.

Taylor testified that after he had gotten the wheelchair onto the sidewalk, he turned the wheelchair slowly to the left and took four to six short steps, placing him and the wheelchair even with the door. Suddenly, Taylor said that he felt the handlebars start to move up. He pushed down on the handlebars to keep the wheelchair from tipping, but Meder was "kicked out" onto the sidewalk. Taylor testified that as he felt the handlebars moving up, he observed Meder's back three to four inches away from the back of the chair.

Immediately after Meder's fall, police were dispatched to the scene and Officer Joseph R. Montileon arrived. Montileon testified that he had conversations with several people, but does not specifically remember the individuals.

There is a dispute as to whether Montileon talked with Meder. Taylor testified that he heard no conversation between them. Meder testified that he could not clearly recall what transpired after the accident. He did testify that he had a conversation with an officer on the way to the hospital. However, Officer Montileon testified that he did not ride in the ambulance. Officer Montileon said that while it was his usual procedure to interview the victim, he did not specifically recall whether he talked to Meder.

Montileon prepared a police report, a portion of which he read into evidence at trial over appellants' objection. The portion read included as an explanation of the cause of the accident that the wheelchair struck the edge of the sidewalk and Meder fell out. However, Montileon was not on the scene at the time of the accident, he did not remember whether Meder made the statement or whether he even spoke with Meder, and he did not recall with whom he spoke at the scene.

## ISSUES RAISED ON APPEAL

On appeal, appellants argue at least seven reasons for reversal of the district court and remand for a new trial. Because we need justify a reversal on only one ground, we will confine our discussion and reversal to the admission of the contents of the police report of Officer Montileon.

Prior to the admission of the contents of the report, counsel met with Judge Hungate in chambers and discussed the admissibility of the report. At that time the district court decided to keep the report out. On the stand, the defendants asked Officer Montileon, over appellants' objection, to recite the contents of the report as to the cause of the injury. The testimony proceeded as follows:

Q. (By Mr. Davis) Officer, I would like to direct your attention to section 35 of your report. Would you read what you have there?

A. Method of commission?

Q. Yes.

A. He was in a wheelchair, struck the edge of the sidewalk, fell out, face down.

Q. And officer, this report was prepared by you. Is that right?

A. Yes.

On cross-examination, counsel for plaintiffs asked the following questions and received the following responses:

Q. You never talked to Mr. Meder about how this accident happened; did you, sir?

A. Because I have "not applicable" in there, does not mean I did not talk to him.

Q. Well?

A. I do not know, I do not recall whether I talked to him or not.

Later the following questions were asked on cross-examination:

Q. (By Mr. Pickett) Do you remember talking to Mr. Meder about how the accident happened at the time, at the scene?

A. I don't recall if it was him or another person.

Q. Do you remember talking to anybody at the scene, as to how the incident occurred?

A. I would have obtained that, either from Mr. Meder, the person that was with him, or someone that did observe it there.

Q. So you are relying on what somebody else told you. Is that not correct?

A. Yes.

■ Appellee argues that several exceptions to the hearsay rule allow this hearsay statement regarding the cause of the accident to be admitted. Basically, appellee argues that the report represents a past recollection recorded, admissible under 803(5) of the Federal Rules of Evidence (Rule 803(5)). This rule, however, only permits the use of the report in testimony where the witness has insufficient recollection to enable him to testify fully and accurately. The underlying hearsay—the origin of the statement about which the declarant had no knowledge—is still a problem.

Appellee argues that this difficulty is overcome through use of any of the following exceptions: admission of a party (Rule 801(d)(2)); present sense impression of the co-worker (Rule 803(1)); excited utterance of a co-worker (Rule 803(2)); record of regularly conducted activity (Rule 803(6)); or public record and report (Rule 803(8)). Appellee contends that if any of these provisions do not provide a basis for relief then the testimony is admissible as that of an expert witness (Rule 702) or that of a lay witness (Rule 701).

### DISCUSSION

*Admission*

■ We reject the argument that the testimony is admissible as the admission of a party, for the simple reason that it has not been shown that Meder made the statement.[2] The officer does not recall speaking to Meder. Meder's only testimony is that he thought he talked to a police officer in the ambulance on the way to the hospital. Yet, the officer testified that he did not ride in the ambulance with Meder. Also, Taylor did not see Officer Montileon and Meder talking.

While we recognize that habit or routine practice may be a means of establishing that a conversation occurred in some instances, (Rule 406), there has not been sufficient proof that this is what occurred here. The officer's testimony that normally he would speak first with the victim does not overcome the evidentiary problem created by his failure to recall with whom he spoke. Hence, there is no showing that this was an admission by Meder.

*Present Sense Impression—Excited Utterance*

■ For the same reasons as cited above, we reject appellee's argument that the testimony is admissible as a present sense impression (Rule 803(1))[3] or an excited utterance (Rule 803(2))[4] of a co-worker. The officer was unable to testify where he obtained the information or even who he had interviewed. Under such circumstances, it is impossible for us to determine whether the maker of the statement was an eyewitness of what occurred at the scene and it was therefore improper to admit the evidence under either of these provisions.

*Record of Regularly Conducted Activity*

■ We reject appellee's argument that the evidence is admissible as a business

2. (d) Statements which are not hearsay.—A statement is not hearsay if— * * *
   (2) Admission by party-opponent.—The statement is offered against a party and is (A) his own statement, in either his individual or a representative capacity * * *.
   Rule 801(d)(2)(A).

3. (1) Present sense impression.—A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter.
   Rule 803(1).

4. (2) Excited utterance.—A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.
   Rule 803(2).

record under Rule 803(6).[5] This exception allows records to be admitted "if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report * * *." However, the evidence shall not be admitted if "the source of information or the method or circumstances of preparation indicate lack of trustworthiness." This is the case here.

We do not know the source of the information, or when or under what circumstances it was obtained. In short, appellants have persuasively argued that we have no way of testing the reliability or trustworthiness of the information. Furthermore, the evidence indicates the information was not trustworthy.

In *Picker X-Ray Corp. v. Frerker*, 405 F.2d 916, 922–23 (8th Cir. 1969), our court rejected an attempt to admit a hospital report made by the business manager after an accident which he knew could result in litigation. Judge Van Pelt observed that there was no indicia of reliability in the report because it was not used for treatment or any other ordinary business purpose but was made with the knowledge that the incident could result in litigation.

▮ We also distinguish *Koppinger v. Cullen-Schiltz & Associates*, 513 F.2d 901, 907 (8th Cir. 1975) on the grounds that in that case there was sufficient opportunity to test the accuracy of the report by cross-examination of the maker and by other evidence submitted. The court concluded that its admission, while not proper, was cumulative, and at most harmless error. In the instant case there was no means of testing the reliability of the report. Therefore, in light of its prejudicial impact, its admission cannot be justified under the business record exception.[6]

## Public Record

▮ We also reject appellee's argument that the report was admissible under the public record exception (Rule 803(8)).[7]

We note that cases have held that police reports are admissible as long as there was no showing of a lack of trustworthiness.[8] However, such is not the case here. Officer

---

**5.** (6) *Records of regularly conducted activity.* —A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.
Rule 803(6).

**6.** We recognize that a lack of personal knowledge of an item in a report goes to the weight of testimony, not its admissibility. However, where, as here, there is a lack of evidence of the source of the testimony, it is inherently untrustworthy and must be kept out. *Forward Communications Corp. v. United States*, 608 F.2d 485, 511 (Ct.Cl.1979) (appraisal value of newspapers for tax purposes should not be admitted because of the lack of evidence establishing the qualification of the preparers, the failure to disclose the identity of the maker of the statement, and the lack of evidence that this was part of a regularly conducted activity).

**7.** (8) *Public records and reports.*—Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, or (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.
Rule 803(8).

**8.** *See Baker v. Elcona Homes Corp.*, 588 F.2d 551, 558 (6th Cir. 1978), *cert. denied*, 443 U.S. 913, 99 S.Ct. 2054, 60 L.Ed.2d 661 (1979) (accident report admissible in law suit concerning a truck-car collision); *Smith v. Spina*, 477 F.2d 1140, 1146 (3d Cir. 1973) (in assault and battery suit against city, the police arrest report was admissible).

**1188**

Montileon could not recall the source of the statement on the report.

Plaintiffs have demonstrated a lack of trustworthiness. It was impossible for the jury to evaluate the trustworthiness of such testimony. Furthermore, in light of the highly prejudicial nature of the testimony and the lack of corroboration, we are satisfied that to admit the evidence was reversible error.

*Expert Witness*

 We reject appellee's assertion that Officer Montileon's testimony should have been admitted as the testimony of an expert witness (Rule 702).[9] There was no foundation laid to establish the officer as an expert witness in wheelchair accident reconstruction. Furthermore, as illustrated in the testimony set out earlier, Officer Montileon testified that the contents of his report were obtained from other persons and were not his own conclusions. Thus, even if he were an expert witness the contents of the report were not his opinions. We therefore reject this rule as a basis for admitting this testimony.

*Lay Opinion*

Finally, we also reject appellee's argument that Officer Montileon's testimony should be admitted as lay opinion (Rule 701).[10] We cannot agree from the evidence on the record that the opinion was "rationally based on the perception of the witness." The source of the testimony was unknown. In fact, the officer was not even sure if it was the statement of Meder or a witness. As we noted earlier, Officer Montileon said that the contents of the report were not his own conclusions. Therefore, none of the contents can be characterized as the officer's opinion. Under such circumstances, it was error to admit this prejudicial testimony.

---

**CONCLUSION**

In conclusion, because the contents of the police report read to the jury were hearsay and appellees failed to justify any exception to the hearsay rule, we find that the admission of the testimony was error. In light of the importance of the testimony, we find its admission to be extremely prejudicial, and therefore reversible error. Because this ground alone justifies reversal and remand for new trial, we need not discuss the alternative grounds for a reversal.

---

9. If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
Rule 702.

10. If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.
Rule 701.